[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Omnibank of Connecticut, Inc. initiated this lawsuit on June 30, 1989 to foreclose upon a mortgage on land in Glastonbury, Connecticut, securing a promissory note of defendant Applewood Estates, Inc. (Applewood) in the amount of $600,000, guaranteed by defendant Ahmed Dadi.
Omnibank merged with New England Savings Bank (NESB) in 1989 which was judicially declared insolvent on motion of the State Banking Commissioner on May 21, 1993. The Federal Deposit CT Page 9095 Insurance Corporation was appointed its receiver, pursuant to12 U.S.C. § 1821(c)(3)(A), on that date and substituted as plaintiff in this action on July 26, 1993. The FDIC assigned the subject mortgage and note to ALI, Inc., which was substituted as plaintiff in this action on March 21, 1994. After the hearing of evidence in this case and during the briefing period, ALI, Inc. assigned the subject mortgage and note to National Loan Investors, L.P. (NLI) which was substituted as plaintiff on February 21, 1995, when the trial was reopened and proceeded to a conclusion.
The defendants Applewood and Dadi filed essentially identical answers admitting the validity of the subject mortgage and note but denying the note was in default. Their answers also allege ten special defenses as follows: (1) Plaintiff Omnibank in 1989 agreed to defer interest payments on the note in exchange for defendant Applewood agreeing to spend $70,000 to build a driveway to a lot in the Applewood subdivision; (2) plaintiff Omnibank refused to release the mortgage on a portion of the land.[,] in violation of the release provision of the mortgage; (3 the subject note was entitled an "Open Note", implying Omnibank was obligated to loan Applewood additional money to construct the road in the subdivision and Omnibank was also obligated to accept the money offered for the partial release of the mortgage and relend it to Applewood to improve the subdivision, which Omnibank failed to do in violation of the mortgage; (4) these violations of the mortgage established the defense of promissory estoppel; (5) they also interfered with defendant's business opportunities; (6) Omnibank, and FDIC breached a settlement agreement reached with defendants in June 1993; (7 and 8) ALI breached an agreement with defendants to assign the subject mortgage and note to defendants' designee in 1994; (9 and 10) NLI breached an agreement with defendants to settle this case and to assign the subject mortgage and note to defendants' designee in 1995.
The defendants also assert fourteen counterclaims against plaintiffs which are premised upon the allegations of the special defenses and claim losses and damages resulting from the breach of provisions of the mortgage and note, violation of the Connecticut Unfair Trade Practices Act, interference with defendant's business, slander of defendant's credit standing, and breach of settlement agreements. They seek equitable relief such as specific performance, cancellation of the note, and denial of foreclosure, and also money damages. The defendant Dadi alleges two additional counterclaims for intentional infliction of CT Page 9096 emotional distress.
The defendant Dadi alone moved for a jury trial on his counterclaims, which was opposed by plaintiffs. The Court denied the motion as to all the counterclaims, except the one claiming intentional infliction of emotional distress, on the grounds they were intermeshed with the foreclosure action and taking the case as a whole, it is essentially equitable in nature. United StatesTrust Co. v. Bohart, 197 Conn. 34, 45 (1985), Texaco v. Golart,206 Conn. 454, 459 (1988). As to the count for intentional infliction of emotional distress, the court ruled that since it was based on acts of plaintiffs upon which the counterclaims rested, judicial economy would be achieved by defendant Dadi presenting all his evidence as if that count were being tried to the jury and the court would determine whether the evidence warranted submitting the issue to the jury. Defendant Dadi concurred in this manner of trial of that issue.
At the start of the trial, the plaintiff ALI, Inc. withdrew its claim against defendant Dadi on the guaranty and for a deficiency judgment.
Since the defendants admitted the execution and delivery of the promissory note, in the face amount of $600,000, at an initial interest rate of 12%, adjusted monthly to equal three percent above the prime rate for Omnibank, and of the mortgage, the only issue as to plaintiff's prima facie case is whether or not the note was in default before plaintiff initiated this action. Defendants contended it was not.
The evidence established that when the mortgage closed on April 19, 1988, Omnibank advanced to Applewood $600,000 but retained $2400 for interest due for the balance of April, plus $36,000 as a reserve for the accrual of six months interest until October 31, 1988. Since interest was due in advance, on November 18, 1988 Omnibank demanded Applewood pay the November interest, plus the additional interest accrued as a result of the increase in interest rates over the past six months, making the total owed $9273.00.06 [$9273.06]. Defendant gave Omnibank two checks totaling $9273.06 on November 30, 1988, which bounced because of insufficient funds. Defendant attempted to replace the check with another on December 30, 1988 which also bounced. Defendant finally covered the bad checks by its check of $9363.06 (the additional amount to cover charges for bad checks) on January 23, 1989, thus paying the interest through November, 1988. The next payment Applewood CT Page 9097 made was on March 16, 1989 for $29,287.50 to cover interest plus late charges for the months of December 1988, January, February and March 1989. Defendant made no further payments and this action was started in June 1989.
Defendant Dadi testified he made an interest payment of $6750 in September 1988 and produced a bank loan payment notice in that amount marked "paid." He admitted, however, having no recollection of going to the bank and having the notice stamped, but stated he found the notice in his files. Omnibank has no record of that payment and its representative could not explain the stamp "paid" on the notice.
Dadi also testified he made a February interest payment, but he did not state the amount of the payment or produce the cancelled check. The Court disbelieves that testimony.
Thus even if the September 1988 payment was made, Applewood was in default as of May 1, 1989, two months before plaintiff started this action.
Defendants next claim Omnibank orally agreed in 1989 to allow an offset against the accrual of interest on the mortgage up to the $70,000 the Applewood intended to spend to build the required road and other improvements in the Applewood subdivision. Dadi testified to the effect such an agreement was reached with Mr. Joseph Perrotta, vice president of Omnibank. Neither plaintiff nor defendant produced Mr. Perrotta to testify, although another officer of Omnibank denied the existence of such an agreement.
This court does not have to decide whether or not such an oral agreement was reached because it clearly is unenforceable under the D'Oench, Duhne doctrine codified at12 U.S.C. § 1823(e). That statute provides that "no agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . either as a security for a loan or by purchase or as a receiver of any insured depository institution, shall be valid against the Corporation unless such agreement:" is in writing, executed by the bank and the obligor contemporaneously with acquisition of the asset by the bank, approved by the board of directors of the bank or its loan committee as reflected in board or committee minutes, and remained an official record of the bank.
The statute applies because the FDIC was appointed receiver CT Page 9098 of New England Savings Bank, successor to Omnibank, in 1993, after the purported agreement with defendants and Omnibank. By the statute referring to agreements which diminish the interest of the FDIC "in any asset acquired by it," its protection follows the asset and extends to assignees of the asset. As stated inCastlegen Inc. v. Resolution Trust Corp.. 984 F.2d 1571, 1577
(10th Cir. 1993).
 "The purpose of the D'Oench doctrine is to permit regulators to accurately appraise the assets of savings institutions by allowing the regulators to rely on the assets face value . . . This face value could not be fully realized if the RTC could not sell the assets to a third party for the amount at which they were valued. A transferee from the FSLIC/RTC must accordingly enjoy the same protection as the Corporation itself does as receiver."
Thus, once a defense based on a side agreement between the bank and a debtor is cut off by the D'Oench doctrine, it is not revived by a transfer of the asset to another party. FDIC v.Newhart, 892 F.2d 47, 50 (8th Cir. 1989) Bell Murphy Assoc. v.Interfirst Bank Gateway, 894 F.2d 750, 754 (5th Cir. 1990).
It follows that the purported oral agreement between defendants and Omnibank cannot be enforced against FDIC, ALI, Inc. or NLI and defendants' defense must fail.
Defendants next defense is that Omnibank cannot prevail because it breached a key provision of the mortgage by not granting a partial release after Applewood had sold a lot to Joseph and Patricia Orsini in November 1989.
The mortgage provides that if the grantor shall not then bein default under the mortgage note or deed, the grantee will release from the lien of the mortgage Parcel One on payment of $350,000. Parcel One, as described in Exhibit A annexed to the mortgage, contained 5.23 acres.
The facts relating to the partial release are as follows: Applewood entered into a contract on November 29, 1989 to sell the Orsinis a lot designated as Lot A-1, consisting of 4.237 acres for $300,000. It requested Omnibank to release Parcel One from the mortgage for the sum of $270,000. CT Page 9099
The parties then commenced negotiations that extended until at least February 1992. The bank remained concerned about the effect a partial release would have on the right of way granted in the mortgage to a back piece of 37 acres also subject to the mortgage. The bank also consistently required, as a condition of the release, that the defendants waive and withdraw all defenses and counterclaims to this then pending foreclosure action. No evidence was adduced that defendants agreed to that condition.
The parties exchanged numerous letters in which proposals and counter proposals were made by each. The court concludes from the testimony and from the correspondence that the parties never reached a meeting of the minds on the terms and conditions of a partial release. Moreover, even if they had, such an agreement, whether oral or in writing, failed to comply with the requirements of 12 U.S.C. § 1823(e) and so would not be enforceable.
Defendants contend that since the $270,000 offered to release 4.237 acres is roughly equivalent to $350,000 for the release of 5.23 acres, Omnibank was obligated under the mortgage to give the partial release without conditions and its failure to do so breached the mortgage and prevents plaintiff from foreclosure.
The court concludes otherwise. The mortgage release provision required that the defendants not be in default as a condition precedent to their entitlement to a partial release. They were then in default. Also the provision that $350,000 be paid for release of Parcel One, consisting of 5.23 acres, is unambiguous and binding upon the parties. The defendants are not entitled to a modification of the contract provision to make it more fair, and the court is not empowered to remake a contract of the parties.
Thus, this court concludes Omnibank did not breach the release provision of the mortgage, no agreement was reached by the parties on the terms and conditions of a partial release, and even if they had and plaintiff did breach it, defendants cannot assert that defense because of the D'Oench doctrine.
Defendants next contend plaintiff cannot recover because Omnibank breached the "Open-End" mortgage by not accepting the $270,000 offered for release of the Orsini lot and then disbursing it to Applewood for improvement of the Applewood CT Page 9100 subdivision. While the mortgage is entitled "Open-End Mortgage Deed", no provisions in it obligate Omnibank to advance additional sums to Applewood for improving the subdivision. Thus, this court will not imply such an obligation from the mere title of the document.
Moreover, if defendants are contending that an oral promise was made by Omnibank at the time the mortgage was executed to advance additional funds to Applewood, such a promise would not be enforceable because it would fail to comply with the statute of frauds and with 12 U.S.C. § 1823(e).
Defendants next assert the defense that Omnibank and NESB violated a settlement agreement reached between the parties during a pretrial conducted by Judge Douglass Wright.
The facts are as follows: Mr. Dadi, Applewood's counsel, Mr. Len Sage, representing NESB, and NESB's attorney met for a pretrial before Judge Wright in January 1993. Mr. Dadi offered to settle the case for $150,000. The bank's representatives required current financial statements of the defendants and current appraisals of properties involved before they could agree. The parties met again at the NESB offices. Defendants provided a preliminary financial statement of Applewood and an appraisal of the lots involved. Defendants offered to pay the settlement figure partly by conveyance of lots already mortgaged to the bank, plus an undetermined amount of cash. When the bank refused that proposal, defendants expressed a willingness to make a firm cash offer and would put it in writing.
At another pretrial meeting before Judge Wright on April 27, 1993, the parties stated to the court that defendants had offered to settle for $151,000 for full release of mortgage and liability which would be forwarded to the Executive Workout Committee (EWC), of NESB for its approval, contingent on: (1) Defendants paying an escrow amount of $1,000, (2) verification by a bank-approved appraiser of defendants' appraisal of the lots showing a net value of $150,000, (3) if approved by the Executive Workout Committee, defendants to pay $150,000 by certified check within two weeks.
Defendants paid the $1,000 in escrow to bank's attorney on May 20, 1993 but never provided an appraisal that bank's appraiser approved because it did not meet MIA standards. Defendants' settlement was, as a result, never submitted for CT Page 9101 approval to EWC and thus never agreed upon by NESB.
NESB was declared insolvent on May 21, 1993 and the FDIC appointed its receiver on that date. The settlement negotiations, even if they had fructified into an agreement, could not be binding upon the FDIC under the D'Oench, Duhne doctrine because any purported agreement failed to comply with the requirements of12 U.S.C. § 1823(e) in that it was not in writing, executed by the bank, approved by the bank's loan committee, and recited in that committee's minutes.
On June 14, 1993, Dadi filed in the Superior Court a document entitled "Notice To The Court of Conditional Settlement," setting forth Dadi's version of the settlement agreement. This document was never signed by any plaintiff in this action, is completely self-serving, and is entitled to no probative weight. Dadi's argument that it must be deemed binding on the plaintiff because no plaintiff objected to it is meretricious.
Defendants next contend that plaintiff ALI, Inc. breached an agreement to assign the subject mortgage and a note to a designee of defendants for the sum of $150,000.
Defendants and ALI started negotiations in January 1994 for ALI to assign the subject mortgage to a designee of defendants for $150,000 and reached an agreement to this effect on March 21, 1994, with the closing to occur on or before April 30, 1994. Defendants clearly had to raise the agreed upon $150,000 from an outside investor and sought an extension of the closing date. ALI extended it to June 17, 1994 and then to June 28, 1994. Defendants had a potential investor who insisted upon a title insurance policy that defendants were unable to provide. That investor held the money available until June 15, 1994, and because defendants could not meet his conditions, withdrew his funds after that date. Defendants, claiming the original assignment from FDIC was defective,[1] also insisted on a new assignment of the mortgage which ALI provided on July 25, 1994. On July 27, 1994 asked for an extension until the end of September, with a further modification that the $150,000 be paid in installments monthly until December 31, 1994. On July 27, 1994, ALI wrote to defendants that unless payment of the $150,000 was made in full on August 1, 1994, the agreement terminated. Thereafter, defendants sought further extensions and modifications of the terms of the agreement, all of which ALI rejected. Defendant did write to ALI on September 13, 1994 CT Page 9102 stating a purported new agreement between the parties, but there was no evidence ALI accepted it. On these facts, this Court concludes the defendants were never able to comply with the agreement reached between the parties and they, rather than ALI, breached it.
Finally, defendants contend that plaintiff NLI breached an agreement reached in February 1995 to settle the case and assign the subject mortgage deed and note to defendant's designee for $100,000.
The facts are as follows: Mike Terry of NLI and Dadi entered into negotiations to settle this case upon terms expressed in Terry's letter to Applewood, dated February 8, 1995, as follows: (1) $10,000 to be paid to NLI on or before February 20, 1995; (2) $90,000 to be paid to NLI on or before March 31, 1995; (3) general release by Applewood and Dadi of all counterclaims and a withdrawal of all special defenses in this action, running in favor of NLI, FDIC, ALI and their agents said general release to be provided by February 20, 1995; (4) time to be of the essence as to all terms and conditions.
Terry and Dadi conversed on the phone and Dadi purported to confirm their oral agreement by his letter dated February 22, 1995 in which he agreed to the $100,000 settlement figure, stated the $10,000 would be paid five days after he received NLI's acceptance of his letter of February 22, 1995, agreed to release NLI only, and set a new closing date of June 18, 1995.
By letter dated March 1, 1995, NLI's counsel agreed to accept a general release of NLI only, but insisted on the March 31, 1995 closing date set forth in Terry's letter of February 8, 1995.
In the meantime Dadi's wife sold stock on February 9 and March 10, 1995 to realize the $10,000 needed for the deposit.
The parties, however, never reached an agreement either orally or in writing as to the closing date. NLI never accepted the terms of Dadi's letter of February 22, 1995 and Dadi never paid the $10,000. On March 20, 1995 NLI's counsel wrote to the defendants withdrawing NLI'S offer to settle on the terms mentioned above.
The Court concludes from these facts that a material term of the settlement discussions was the closing date because at the CT Page 9103 time of the negotiations the evidence in this trial had been completed, the parties were writing briefs and time was critical. There was never a meeting of the minds on that material term, so no agreement was ever reached by the parties which NLI could have breached.
Thus, defendants have proven none of their special defenses and plaintiff is entitled to a judgment of foreclosure.
Turning to defendants' counterclaims, since they are premised upon the facts alleged in the special defenses, they must also fail. Thus, the First Counterclaim alleging plaintiff's breach of the release provision of the mortgage relating to a lot sold to the Orsinis was not proven. The Second Counterclaim that that breach violated Connecticut Unfair Trade Practices Act, CGS § 42-110a et seq. must also fail. The Third Counterclaim that plaintiff failed to fulfill an alleged obligation in the mortgage to advance defendants additional money to build roads in the Applewood subdivision was not proven. The Fourth Counterclaim that that alleged failure violated CUTPA must also fail. The Fifth and Sixth Counterclaims that the plaintiffs allegedly breached the mortgage by failing to release the Orsini lot and to advance additional funding, thereby wrongfully interfering with defendants' business and slandering Dadi's credit standing, were not proven. The Seventh, Eighth, Ninth and Tenth Counterclaims that NESB, FDIC and ALI breached agreements to settle and to assign the mortgage deed and note were not proven. The Eleventh Counterclaim that ALI's alleged breach of those agreements violated CUTPA must also fail.
The Thirteenth and Fourteenth Counterclaims, which reiterate the allegations of the Tenth and Eleventh Counterclaims, were not proven. The Fourteenth and Fifteenth Counterclaims that NELI breached a settlement agreement with defendants was not proven.
The Twelfth and Sixteenth Counterclaims allege that the acts of Omnibank, FDIC, ALI and NLI alleged in all the other counterclaims intentionally caused defendant Dadi emotional pain, suffering and distress. The court recognized that Dadi was entitled to a jury trial on these two counterclaims. However, it also recognized that all the evidence to sustain those counterclaims would be the same as adduced to prove defendants' special defenses and other counterclaims. Consequently, it directed that Dadi should submit all of his evidence to establish the cause of action for intentional infliction of emotional CT Page 9104 distress, including medical evidence, and this court would determine whether or not that evidence was sufficient to require the cause to be submitted to the jury. If Dadi met that burden, with every inference on the evidence made favorable to him, the court would allow Dadi to proceed to a trial before a jury on that cause. Dadi concurred with this procedure.
Dadi presented evidence to the effect that all the conduct of the plaintiffs in breaching provisions of the mortgage and violating agreements caused him extreme emotional suffering, including a stomach ulcer.
Plaintiffs Omnibank and FDIC defend on the ground that Dadi failed to comply with the provisions of Financial Institution Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1821
(a)(5)(C) in that Dadi never filed a proof of claim as to the cause for intentional infliction of emotional harm. That section provides that unless a claim is filed with the FDIC within a specified period "it shall be disallowed and such disallowance shall be final."
The evidence in this case is that Dadi filed a proof of claim with the FDIC but it stated losses relative to breaches of the mortgage by Omnibank. It did not state any tort claim for intentional infliction of emotional distress. In Coleman v. FDIC,826 F. Sup. 31 (Mass. 1993) the court held it lacked subject matter jurisdiction to consider claims that had not been first submitted to the FDIC through its administrative claims process. In Brown Leasing Company v. FDIC, 833 F. Sup. 672 (N.D. Ill. 1993) the court took jurisdiction of claims in a complaint which had been filed with the FDIC, but refused to hear the claims of conversion and breach of contract which had not been filed with the FDIC. See also Hibyan v. FDIC, 812 F. Sup. 271 (Me. 1993).
Thus the actions of Omnibank and NESB prior to the appointment of the FDIC on May 21, 1993 cannot be the basis of a claim for emotional infliction of emotional distress against Omnibank, NESB or FDIC.
Petyan v. Ellis, 200 Conn. 243, 253 (1986) sets forth the four elements of a claim of intentional infliction of emotional distress: (1) the act was intended to inflict emotional distress or the actor should have known it would have that result; (2) the actor's conduct was extreme and outrageous; (3) the conduct caused the distress; and (4) the emotional distress was severe. CT Page 9105
Giving defendant every favorable inference, this Court finds no evidence to substantiate that any plaintiff intended to inflict emotional distress on Dadi or could have known its conduct would cause that result, or that any plaintiff's conduct was extreme and outrageous. The banks and the FDIC conducted their business with Dadi with scrupulous fairness and tried in every way to reach an accommodation with him that would enable him to salvage something from his property. The failures to reach agreements were entirely the fault of Dadi and of his inability to comply with the bank's reasonable requirements.
Thus, this Court concludes that Dadi failed to submit sufficient evidence to have his claim of intentional infliction of emotional distress submitted to a jury.
Accordingly, this court renders judgment for the plaintiffs and the FDIC on defendants' counterclaims. It further finds the debt owed by defendants to be $989,216,[2] the subject property to have a value of $400,000. It renders a judgment of strict foreclosure, sets the law day for September 25, 1995, awards plaintiff the sum of $2950 as an appraiser fee and since plaintiff has not sought an attorney fee, awards none.
The Court adds one further note. This has been a long, complex case. The defendants were given full opportunity to present their defenses and counterclaims. Mr. Dadi conducted most of trial as his own counsel and did so with rare proficiency. He proved a better lawyer than mortgagor. No trial judge can, of course, give finality to a case, but this judge endeavored to consider fully every issue presented in the hope of convincing all the parties that an ending of this matter serves all their interests.
Robert Satter State Judge Referee